## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

---

DELAWARE RIVERKEEPER
NETWORK and MAYA K VAN
ROSSUM, agent of Delaware Riverkeeper
Network,

          Plaintiff,

    v.

DELAWARE RIVER BASIN
COMMISSION and DELAWARE RIVER
PARTNERS, LLC,

          Defendants.

Civ. No. 21-cv-01108 (RBK)

**OPINION**

---

**KUGLER, District Judge**

Presently before the Court is Plaintiffs' motion for summary judgment (ECF 45), Defendant Delaware River Partners, LLC's motion to strike (ECF 50), Defendant Delaware River Basin Commission's cross-motion for summary judgement, and Defendant Delaware River Partners, LLC's cross-motion for summary judgment (ECF 53). For the reasons expressed below, Defendant Delaware River Partners, LLC's Motion to Strike is **GRANTED** in part and **DENIED** in part. Plaintiffs' Motion for Summary Judgment is **DENIED**. Defendant Delaware River Partners, LLC's Cross-Motion for Summary Judgment and the Delaware River Basin Commission's Cross-Motion for Summary Judgment are **GRANTED**.

## I.      BACKGROUND

### A.  The Delaware River Basin Compact and Commission

The Delaware River Basin Compact (the "Compact") is an agreement between the United States, New York, New Jersey, Pennsylvania, and Delaware to cooperatively manage the water resources of the Delaware River Basin. (Doc. No. 45-1 at ¶ 4; Doc. No. 45-2 at 5).[1] In order to effectuate this goal, the Compact created the Delaware River Basin Commission (the "Commission"), a defendant in this action. (Doc. No. 45-1 at ¶ 4). The Commission is a regulatory agency that was tasked with creating a Comprehensive Plan for use of the Delaware River Basin water resources. Delaware River Basin Compact ("Compact"), § 13.1. Thereafter, it is the Commission's responsibility to review project proposals associated with the Delaware River Basin, consider whether the project comports with the goals of the Comprehensive Plan, and determine approval of project proposals. *Id.*

According to the Compact, "[t]he commission shall approve a project whenever it finds and determines that such project would not substantially impair or conflict with the comprehensive plan and may modify and approve as modified, or may disapprove any such project whenever it finds and determines that the project would substantially impair or conflict with such plan." Compact, § 3.8. For any action to be approved, it must receive a majority affirmative vote. *Id.* at § 2.5. In addition, the Compact instructs that the Commission's determinations "shall be subject to judicial review in any court of competent jurisdiction." *Id.* at § 3.8.

### B.  Delaware Riverkeeper Network

---

[1] For purposes of simplicity, and except where Defendants' responses or additional statements add further information, we cite to Plaintiffs' Statement of Facts in setting out the factual background

The Delaware Riverkeeper Network is a "not-for-profit membership organization established to protect and restore the Delaware River, its tributaries and habitats." (Doc. No. 45-1 at ¶ 1). Maya van Rossum is the Delaware Riverkeeper, which makes her chief executive officer of the Delaware River Network. (Doc. No. 45-1 at ¶ 3). The Delaware Riverkeeper Network and Maya van Rossum are Plaintiffs in this action.

### C.  The Gibbstown Logistics Center

The Gibbstown Logistics Center ("GLC"), in Gibbstown New Jersey is "a multi-use deep-water seaport and industrial logistics center." (Doc. No. 45-1 at ¶ 7; Doc. No. 53-2 at ¶ 1). The GLC is located on a site formerly owned and operated by DuPont and later Chemours, where the DuPont Repauno Works facility was located. (Doc. No. 45-1 at ¶¶ 6, 25; Doc. No. 53-2 at ¶ 2). Beginning in the 1880s, the site was used for chemical research and manufacturing. (Doc. No. 45-1 at ¶ 20). This included, between 1880 and 1954, use for manufacturing dynamite. (Doc. No. 45-1 at ¶ 21). Then after 1954, the focus of the site was on manufacturing "commodity chemicals, primarily nitric acids." (*Id.*). In 1965, the Commission approved Docket No. D-1965-075-001, which allowed DuPont to store "20,000 tons of anhydrous ammonia within a cavern on the site." (Doc. No. 45-1 at ¶ 22).

This site is subject to ongoing environmental remediation, including ongoing groundwater remediation. (Doc. No. 45-1 at ¶¶ 25, 38–39). Chemours has completed soil remediation and accordingly received multiple Response Action Outcomes. (*Id.*; Doc. No. 53-3 at ¶ 39). As part of the remediation, Chemours must control and reduce polychlorinated biphenyl ("PCB") discharges via stormwater runoff. (Doc. No. 45-1 at ¶ 40).

Delaware River Partners, LLC ("Delaware River Partners"), defendant in this action, acquired the site from Chemours in 2016. (Doc. No. 45-1 at ¶ 26; Doc. No. 53-2 at ¶ 3). Also in

2016, the Commission granted Delaware River Partners' request to transfer the Docket No. D-1965-075-001 to it for use as storage for liquefied petroleum gas. (Doc. No. 45-1 at ¶ 33).

### D. The Dock 1 Docket

In December 2017, the Commission approved a construction project at the GLC through Docket D-2017-009-1 (the "Dock 1 Docket) requested by Delaware River Partners. (Doc. No. 45-1 at ¶¶ 41–44; Doc. No. 53-2 at ¶ 7). The construction included dredging 371,000 cubic yards of sediment from the Delaware River. (Doc. No. 45-1 at ¶ 45; Doc. No. 53-2 at ¶ 8). The Dock 1 Docket included a condition that Delaware River Partners implement a stormwater sampling plan to assess the presence of PCBs. (Doc. No. 45-1 at ¶ 46). Plaintiffs did not appeal the Commission's determination. (Doc. No. 53-2 at ¶ 9).

### E. The Dock 2 Docket

In March 2019, Delaware River Partners applied to the Commission to approve the Dock 2 Project. (Doc. No. 45-1 at ¶ 48; Doc. No. 53-2 at ¶ 16). Following a public hearing and comment period, in June 2019, the Commission approved Docket 2017-009-2 (the "Dock 2 Docket"). (Doc. No. 45-1 at ¶¶ 48–51; Doc. No. 53-2 at ¶ 19). The Commission issued the Dock 2 Docket to Defendant Delaware River Partners. (*Id.*).

In connection with this Project, Delaware River Partners also sought and received permits from the New Jersey Department of Environmental Protection ("NJDEP") and the United States Army Corps of Engineers ("USACE"). (Doc. No. 45-1 at ¶¶ 53–65; Doc. No. 53-2 at ¶¶ 17, 20). The USACE consulted with the National Marine Fisheries Service ("NMFS") as well during its permitting process. (Doc. No. 45-1 at ¶ 61).

### F. The Dock 2 Project

The Project that is the subject of this case is set to be constructed at the GLC and is an addition to the existing seaport and center. (Doc. No. 45-1 at ¶ 7). The Dock 2 Docket site is downriver from the Dock 1 site. It will be "directly across the River's main navigational channel from the downstream end of Little Tinicum Island." (Doc. No. 45-1 at ¶ 13). At the location of the Project the Delaware River is 5,300 feet wide. (Doc. No. 45-1 at ¶ 14). The shoreline at Thompson point to Little Tinicum Island is "slightly less than 3,000 feet." (*Id.*). The main navigational channel is 800 feet wide at this location. (Doc. No. 45-1 at ¶ 15). The Project is set to be 650 feet from the shoreline and 840 feet from the main navigational channel. (Doc. No. 45-1 at ¶ 16; Doc. No. 53-2 at ¶ 13).

The dredging required for construction would occur at least 600 feet from the shoreline. (Doc. No. 45-1 at ¶ 16; Doc. No. 53-2 at ¶ 14). At this point, water depths are mostly 30 to 40 feet, except for a small area in the southwest portion of where the dredging will occur where the depths are 20 to 30 feet. (Doc. No. 45-1 at ¶ 18; Doc. No. 53-2 at ¶ 15). Water heights vary from about three to five feet depending on tidal influences. (Doc. No. 45-1 at ¶ 19).

Construction for the Dock 2 Project will include dredging 665,000 cubic yards of sediment from the Delaware River in a 45-acre area. (Doc. No. 45-1 at ¶ 35; Doc. No. 53-2 at ¶ 12). It will also include construction of two deep-water berths and supporting infrastructure. (*Id.*). The majority of the structure is over water, however, the construction "will temporarily disturb approximately 0.8 acres of land." (*Id.*).

### G. Appeal and Hearing

Unlike the Dock 1 decision, Plaintiffs appealed the Commission's determination to approve the Dock 2 Docket. The Delaware River Network requested an administrative hearing to present its objections to the Dock 2 Docket. (Doc. No. 45-1 at ¶ 66). The Commission granted

this request. (Doc. No. 45-1 at ¶ 67). A Hearing Officer, John D. Kelly, Esquire, presided over the administrative proceedings. (Doc. No. 45-1 at ¶ 68). The eight-day hearing was held in May 2020 via video conferencing due to the COVID-19 pandemic. (Doc. No. 45-1 at ¶ 71; Doc. No. 52-2 at 6 ¶ 71; Doc. No. 53-3 at ¶ 71). The direct testimony from the witnesses was presented in written format, and the hearing consisted of cross-examination, re-direct, and rebuttal testimony. (Doc. No. 45-1 at ¶ 72; Doc. No. 53-3 at ¶ 72).

Prior to the hearing, Delaware River Partners sought to exclude certain evidence, including (1) reference to the approval of the Dock 1 Project, (2) any cumulative effect of the two projects, (3) reference to alleged violations of the Dock 1 Docket, (4) reference to issues related to liquefied petroleum gas, and (5) reference to issues related to increased ship traffic. (Doc. No. 45-1 at ¶ 69; Administrative Record ("A.R.") at II.30). The Hearing Officer denied most of these restrictions, but did preclude reference to "violations of the Dock 1 Docket offered for the purpose of discrediting [Delaware River Partners] as an entity" as well as refence to "fish strikes caused by increased vessel traffic." (Doc. No. 45-1 at 6 ¶ 70; A.R. II.37).

The Delaware River Network presented testimony from members of the Delaware River Network as fact witnesses with familiarity of the area. (Doc. No. 45-1 at ¶ 73). The Delaware River Network also proffered expert testimony on the following topics: aquatic ecology with a focus on freshwater invertebrates; exposure assessment and risk assessment; analysis of urban vegetation and establishment of functioning ecosystems in vegetative spaces; fisheries, fish biology and fisheries management; water resource evaluations, aquifer testing, groundwater flow modeling, and groundwater-surface water interaction, and groundwater remediation; stormwater management, water quality protection, civil engineering and land development, project management, and construction administration. (*Id.*).

The Commission presented their Project Review Manager, David Kovach, as a fact witness. (Doc. No. 45-1 at ¶ 74).

Delaware River Partners presented Laura George, a consultant from Ramboll, "a global engineering, architecture, and consultancy firm" as a fact witness. (Doc. No. 45-1 at ¶ 75). It also presented experts on the topics of: civil and geotechnical engineering, dredging, dredging disposal, industry and regulatory standards for dredging projects, with particular expertise for projects on the Delaware River; environmental chemistry, analytical requirements and data quality and analytical data validation; water quality studies and sediment and water quality investigations; geology, PCB sampling and analysis, and PCB water quality assessment; chemical engineering, potential water quality risks associated with trans-loading and shipping of bulk liquid products, and industry standards, regulatory compliance and safety record associated with commercial shipping and the construction and operation of marine terminal facilities; anadromous fish biology; and hydrogeology, contaminated site remediation, and the Federal Resource Conservation and Recovery Act. (*Id.*).

The Hearing Officer considered the evidence presented at the administrative hearing as well as argument presented in pre- and post-hearing briefing. On July 21, 2020 the Hearing Officer issued an extensive, 102-page Report of Findings and Recommendations ("Findings of Fact"). The Hearing Officer recommended that the Dock 2 Docket remain as approved, and found that the Delaware River Network failed to demonstrate that Dock 2 would substantially impair or conflict with the Comprehensive Plan. (Doc. No. 45-1 at ¶ 76; Doc. No. 52-2 at 23 ¶¶ 1, 3).

The parties then had an opportunity to submit objections to the Hearing Officer's Report and submit further briefs. (Doc. No. 45-1 at ¶¶ 77–78). These submissions included a submission

from the Commission Staff, DRBC Staff Comments on Hearing Officer's Report and Interested

Party Objections; Recommended Commission Action. The Commission then considered the

submissions and the extensive record, and on December 9, 2020 issued a decision that affirms its

approval of the Dock 2 Docket. (Doc. No. 45-1 at ¶ 79; Doc. No. 52-2 at 23 ¶ 4). The

Commission voted to uphold the approval with a vote of four in favor, zero against, and one

abstention. (Doc. No. 52-2 at 23 ¶ 4). The Commission issued its Opinion on December 9, 2020,

finding that that the Delaware River Network failed to demonstrate that the Dock 2 Project

would substantially impair or conflict with the Comprehensive Plan or that the administrative

record contained insufficient evidence to support approval. (Doc. No. 45-1 at ¶ 79). The

Commission Opinion set out its conclusions and supporting evidence in the record. (A.R. II.118,

Comm'n Op.). The Commission Opinion also incorporated by reference parts of the DRBC Staff

Comments. (Comm'n Op. at 11 ("Without restating the entirety of the DRBC Staff Comments,

this Opinion emphasizes certain of the reasons for the Commission's determination.")). It also

incorporated by reference the Hearing Officer's Findings of Fact (A.R. II.119), with

modifications set out in Appendix A to the Opinion. (*Id.* at 10).

### H.  Appeal to the District Court

Plaintiffs, the Delaware River Network and Maya van Rossum in her capacity as chief

executive officer of the Delaware River Network (collectively, "Plaintiffs"), appealed the

Commission's decision, filing their Complaint in this Court on January 25, 2021. (Doc. No. 1).

On March 18, 2021, Defendant Delaware River Partners, LLC filed its Answer (Doc. No. 9), and

on March 29, 2021, the Delaware River Basin Commission filed its Answer (Doc. No. 14). On

April 30, 2021, Plaintiffs filed a Motion to Complete the Administrative Record. (Doc. No. 19).

This Court denied Plaintiffs' Motion, determining that the proffered documents were outside the administrative record and limiting its review to the administrative record. (Doc. No. 32, 33).

On February 4, 2022, Plaintiffs filed their Motion for Summary Judgment. (Doc. No. 45). On March 17, 2022, Defendant Delaware River Partners filed a Motion to Strike, seeking to strike an exhibit and declarations attached to Plaintiffs' Motion for Summary Judgment. (Doc. No. 50). On March 18, 2022, the Delaware River Basin Commission filed its Response and Cross-Motion to Plaintiff's Motion for Summary Judgment. (Doc. No. 52). That same day, Defendant Delaware River Partners also filed its Response and Cross-Motion. (Doc. No. 53). On April 4, 2022, Plaintiffs filed their Response to the Motion to Strike. (Doc. No. 55). On April 11, 2022, Defendant Delaware River Partners filed its Reply in support of its Motion to Strike. (Doc. No. 56). On April 15, 2022, Plaintiffs file their Response to Defendants' Cross-Motions for Summary Judgment and Reply in support of Plaintiffs' Motion for Summary Judgment. (ECF 57). On April 29, 2022, Defendant Delaware River Basin Commission filed its Reply in Support of its Cross-Motion for Summary Judgment. (Doc. No. 58). Finally, also on April 29, 2022, Delaware River Partners filed its Reply in Support of its Cross-Motion for Summary Judgment. (Doc. No. 59).

## II.   SUBJECT MATTER JURISDICTION

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and the Compact, which states that "[t]he United States district courts shall have original jurisdiction of all cases or controversies arising under the Compact." Compact, § 15.1(p).

## III.   LEGAL STANDARD

This case is before the Court for judicial review of the Delaware River Basin Commission's decision. The Commission is governed by the Delaware River Basin Compact.

The Compact is an agreement between the United States, New York, New Jersey, Pennsylvania, and Delaware to manage the water resources of the Delaware River Basin. The Commission is not a federal agency. Accordingly, and as explicitly stated in the Compact, the Commission is not subject to the Administrative Procedure Act. Compact at § 15.1(m); *Wayne Land & Min. Grp. LLC v. Delaware River Basin Comm'n*, 894 F.3d 509, 525 (3d Cir. 2018) ("By its terms, however, the Compact is not subject to the APA.").

The Compact clearly provides for judicial review of Commission decisions. Compact at § 3.8 ("Any determination of the commission hereunder shall be subject to judicial review in any court of competent jurisdiction."); 18 C.F.R. § 401.90 ("Any party participating in a hearing conducted pursuant to the provisions of this subpart may appeal any final Commission action."). The Compact does not, however, detail a standard of review for courts to apply, nor do any of the related regulations. Thus, although the Commission is not governed by the APA, courts have utilized a similar standard of review to the APA "arbitrary and capricious" standard or the "substantial evidence standard" in evaluating decisions by the Commission. *Delaware Water Emergency Grp. v. Hansler*, 536 F. Supp. 26, 39 (E.D. Pa. 1981), *aff'd*, 681 F.2d 805 (3d Cir. 1982); *Delaware Riverkeeper Network v. Delaware River Basin Comm'n*, No. 10-5639, 2011 WL 3882503, at *2 (D.N.J. Sept. 2, 2011) (referencing the arbitrary and capricious standard); *Delaware Riverkeeper Network v. Collier*, No. 11-0423, 2011 WL 3882506, at *3 (D.N.J. Sept. 2, 2011) (same). The parties to this action similarly rely on APA caselaw in support of their summary judgment briefing. (ECF 45-2 at 7; ECF 52-1 at 15; ECF 53-1 at 11). Accordingly, this Court will consider cases interpreting the APA as a guide, but not binding authority.

The question remains whether this Court should apply the "arbitrary and capricious" standard or the "substantial evidence" standard. *Hansler*, 536 F. Supp. at 39 ("Many, if not most

cases, that have been confronted with a choice between applying an 'arbitrary and capricious' and a 'substantial evidence' standard of review of agency action have neatly side-stepped the issue by ruling that the same result would obtain under the facts of the case being decided, under either test."). Under the APA, the "substantial evidence" test is appropriate where "the agency action is based on a public adjudicatory hearing." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971). Because there was a public adjudicatory hearing here, we will follow the guidance of APA caselaw and apply the "substantial evidence" standard of review. In this context, substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). It is "more than a mere scintilla." *Id.*

Pursuant to Section 3.8 of the Compact the Commission "shall approve a project whenever it finds and determines that such project would not substantially impair or conflict with the comprehensive plan and may modify and approve as modified, or may disapprove any such project whenever it finds and determines that the project would substantially impair or conflict with such plan." Thus, the question before this Court is whether there was substantial evidence to support the Commission's finding that the Dock 2 Project would not substantially impair or conflict with the comprehensive plan.

Although this case comes before us now on a motion and cross-motions for summary judgment, we note that the summary judgment consideration of whether there is a genuine issue of material fact "is not a perfect fit when the motions seek review of administrative decisions." *N.G. v. N. Valley Reg'l High Sch. Bd. of Educ.*, No. 15-4419, 2017 WL 5515913, at *5 (D.N.J. Mar. 31, 2017). Instead, the summary judgment motions act as a mechanism to initiate briefing.

Because "[t]he entire case on review is a question of law", "the district judge sits as an appellate tribunal." *Neto v. Thompson*, 506 F. Supp. 3d 239, 243–44 (D.N.J. 2020).

## IV. <u>MOTION TO STRIKE</u>

Before reaching the merits of the summary judgment motions, this Court must first resolve the motion to strike. Delaware River Partners argues that Plaintiffs "seek to expand the certified administrative record before the Court, this time by attaching exhibits to the Brief submitted in support of their Motion for Summary Judgement." (ECF 50-1 at 6). First, Delaware River Partners asserts that Plaintiffs have ignored this Court's Order and included a document as an exhibit to their motion for summary judgment that was included in the set of documents that were the subject of Plaintiffs motion to correct the administrative record. (*Id.*). As explained above, this Court denied Plaintiffs' motion. (*See id.*). This document is a Total Maximum Daily Load ("TMDL") Report for Polychlorinated Biphenyls ("PCBs") issued by the Delaware River Basin Commission in 2003. (*Id.* at 9). Second, Delaware River Partners seeks to strike three declarations, one from Plaintiff Maya van Rossum and the other two from members of the Delaware River Network. (*Id.* at 10–11). Delaware River Partners argues that these declarations "incorporate extra-record material that goes far beyond what would be needed to meet Plaintiffs' burden on the issue of standing." (*Id.* at 7). It argues that even if the Court does not strike the declarations in their entirety, "[o]nly small portions of Plaintiffs' declarations would be necessary to meet their standing burden" and as such the Court should strike the remaining "unnecessary and irrelevant" material. (ECF 50-1 at 16–17).

In general, the court's review of an agency's decision is limited to the administrative record. *See Tinicum Twp., Pa. v. U.S. Dep't of Transp.*, 685 F.3d 288, 294 (3d Cir. 2012) ("We confine our review to the administrative record upon").

### A.  TMDL Report

Plaintiffs admit that the TMDL Report was an attachment to a petition that Plaintiffs sought to add to the record through their prior motion, but they clarify that they are not seeking to reintroduce the petition as evidence. (Doc. No. 55 at 8). Moreover, Plaintiffs respond that the TMDL Report is a "binding regulatory document." (*Id.* at 9). In the alternative, they ask the Court to take judicial notice of the TMDL report, and aver that this is appropriate because it is "a published report of a governmental agency." (*Id.* at 12).

Delaware River Partners argue that there are limited exceptions to the rule that review of an administrative determination is limited to the administrative record, and the TMDL Report does not meet any of the exceptions. Specifically, it is not being used to establish standing, in support of allegations of bias against the agency, or because "the administrative record 'does not disclose the factors considered by an agency or the agency's construction of the evidence.'" (Doc. No. 50 at 12–13 (*quoting Horizons Int'l, Inc. v. Baldrige*, 811 F.2d 154, 162–63 (3d Cir. 1987)).

Plaintiffs seek to include the TMDL Report in support of their argument that the Commission erred in not considering the PCBs TMDL. (Doc. No. 55 at 11). As discussed below, we have determined that this argument is waived, as Plaintiffs did not raise it before the Commission. Thus, Plaintiffs have not presented any rationale for expanding the record before this Court beyond the administrative record to include the TMDL. Delaware River Partners' Motion to Strike the TMDL Report will be granted.

### B.  Declarations

As for the declarations, Plaintiffs explain that they are included to establish standing, and that "any opinions contained in the declarations are included only to support standing: they are not presented as extra-record expert testimony." (*Id.* at 15).

While our review is limited to the administrative record, declarations made in support of plaintiffs' standing are an exception to this restriction. In order to establish standing at the summary judgment phase, plaintiffs are required to "'set forth' by affidavit or other evidence 'specific facts.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (*citing* Fed. R. Civ. P. 56(e)). Although Defendants do not challenge whether Plaintiffs have standing to bring the instant case, Plaintiffs note that "this Court may always raise the jurisdictional issue of standing *sua sponte*." (Doc. No. 55 at 15).

We appreciate Defendants' position that "[o]nly small portions of Plaintiffs' declarations would be necessary to meet their standing burden." (Doc. No. 50-1 at 16). However, this Court will deny the motion to strike the declarations. This Court will consider the declarations only to the extent that they are offered in support of Plaintiffs' standing.

### V.  <u>MOTION FOR SUMMARY JUDGMENT</u>

Plaintiffs argue that summary judgment should be granted in their favor because the Commission's decision to issue a docket for the Dock 2 Docket "was arbitrary, capricious, and an abuse of the Commission's discretion under the Compact." (Doc. No. 45-2 at 5). They therefore ask that this Court vacate the Commission's decision, and remand this matter to the Commission with instruction to obtain additional information or deny the Project. (*Id.* at 6).

The Commission responds that "[t]he extensive record shows the Commission exercised its authority with diligence and faithfulness, and its challenged decisions are grounded in

substantial evidence in the record." (Doc. No 52-1 at 7–8). In addition, the Commission argues

that while Plaintiffs note that they bear the burden of demonstrating that the decision below was

arbitrary and capricious and lacked substantial evidence, their motion "largely ignores the

standard and implicitly invites this Court to conduct a de novo review of the evidence and the

Commission's determination." (*Id.* at 7). They therefore ask the Court to deny Plaintiffs' motion

and grant summary judgment in favor of the Commission. (*Id.* at 8).

Defendant Delaware River Partners responds that "Plaintiffs' objections mirror those

raised below" during the administrative process, and include one additional objection that is

beyond the scope of the administrative record. (Doc. No. 53-1 at 9–10). As for the objections

raised below, Delaware River Partners asserts that "[t]he administrative record shows that [the

Commission] considered and rejected each of these objections." (*Id.* at 10). Delaware River

Partners thus asks this Court to deny Plaintiffs' motion for summary judgment, and grant

summary judgement in favor of Delaware River Partners. (*Id.*).

### A. The Commission's Determination that the Dock 2 Project Would Not Substantially Impair or Conflict with the Comprehensive Plan

First, Plaintiffs argue that "[k]ey gaps in the information provided to the Commission, as

well as unfounded assumptions based on those gaps, render the Commission's conclusions

arbitrary, capricious, and an abuse of discretion." (Doc. No. 45-2 at 15). The Commission

responds that Plaintiffs' brief "ignores the Commission's Opinion, its incorporated findings and

other materials, and the evidence in the record that is contrary to [Delaware River Network's]

position." (Doc. No. 52-1 at 18). Delaware River Partners argues that the Commission's

decision, "with the benefit of eight days of testimony, ample documentary evidence, and the

factual findings of an independent hearing officer, was based on an abundance of information

that more than justified [the Commission's] conclusion to approve the Dock 2 Docket." (Doc. No. 53-1 at 14–15).

### i. The Commission's Reliance on a Sediment Sampling and Analysis Plan

Plaintiffs allege that a "limited and imprecise" sampling protocol was used to analyze the impact of dredging sediment as part of Dock 2's construction. (Doc. No. 45-2 at 16). They state that the Commission approved this protocol, and that the analysis did not provide the Commission with the required information to determine how the proposed dredging would affect the River. (*Id.* at 15). The protocol pulled samples from different areas and depths of the River, mixed the sediment together, and then analyzed the mixed sediment. (*Id.*). Plaintiffs explain that this "'composite' sampling is designed to determine the best disposal method for dredged sediments," not determine the water quality impacts of sediment disturbance in the river during dredging. (*Id.*). They allege that the protocol used is imprecise for the purpose of determining disturbance and "additional sampling data was required for the Commission to determine whether the Dock 2 Project substantially impaired or conflicted with the Comprehensive Plan." (*Id.* at 16–17).

The Commission responds that Plaintiffs raised these same arguments during the administrative process, as well as to the NJDEP, USACE, and NMFS during their permitting processes, and that the Commission nonetheless determined that the composite sampling process was sufficient to determine the information needed to conclude that the dredging would not substantially impair or conflict with the Comprehensive Plan. (Doc. No. 52-2 at 20–24). It asserts that the determination was supported by substantial evidence, based on expert testimony and "additional precautions" that would be take during the dredging. (*Id.* at 20–21).

Delaware River Partners claims that Plaintiffs "fail to cite to any [Commission] rule, regulation, guidance or standard to support their position" that additional sampling data was required. (Doc. No. 53-1 at 16). Moreover, it notes that the Commission acted within its "inherent discretion" in relying on information from agencies of its member governments, here NJDEP." (*Id.* at 17). It points to information throughout the record and Commission's Opinion that demonstrate "the Commission acted reasonably and well within its discretion when it determined that it had sufficient information concerning the quality of the sediments to be dredged to issue the Docket." (*Id.* at 17–18).

The Commission Opinion concluded that "the proposed dredging for Dock 2 under the conditions imposed in the Docket would not substantially impair or conflict with the Comprehensive Plan." (Comm'n Op. at 13). In response to the same argument Plaintiffs put forth here, the Commission Opinion pointed to expert testimony. (*Id.* at 16). The Opinion explained that "[a]ccording to their testimony, the bulk sediment data, which are primarily used to characterize dredged sediment for purposes of disposal, also provide information about contaminants that may be resuspended during dredging." (*Id.*). In support of this statement, the Opinion cited to testimony from expert Jerry J. Pasquale, who is Chief of Environmental Resources Branch of the USACE and an expert in water quality studies, sediment, and water qualities investigations. (*Id.*). The Commission explained that the results of the composite testing "showed contaminant concentrations typical of sediments for this section of the Delaware River." (*Id.*). The Commission concluded that based on the results of the composite samples, in conjunction with the BMPs that were to be employed, additional sampling was not needed. (*Id.*).

The Commission's conclusion is supported by Pasquale's expert report stating that the composite testing is "used to identify contaminants that may be of concern and warrant further

evaluation," and where the results demonstrated concentrations typical of this section of the Delaware River, no further testing was needed. (A.R. DRP-127, Pasquale Report at 2, 4 ("given the relatively clean quality of the sediment, the potential temporary resuspension of sediment during dredging would not pose any water quality concerns."). As indicated in the Staff Comments that the Commission incorporated in its Opinion, expert testimony from David R. Blye[2] and Gregory J. Cavallo[3] also supported this conclusion. (Comm'n Op. at 16; A.R. II.108, Staff Comments at 5–6). Specifically, Blye testified that although the primary purpose of the composite sampling was to determine how to dispose of the sediment, "that doesn't mean that you can't not [sic] get some information relative to water quality . . . looking at the data and the fact that it is relatively clean sediment, to me that would indicate that there would be minimal impacts to water quality." (A.R. IV.6, Tr. 1823:22–1824:4 (Blye)). Cavallo stated in his expert report that "the PCB concentrations in the sediment to be dredged for dock construction are actually very low. As a result, there is little PCB mass that could theoretically be resuspended and released to the water column." (A.R. DRP-130, Cavallo Report at 6). He also noted that "removal and sequestration of any PCB-contaminated sediment, regardless of the degree of contamination, is actually a net benefit to water quality." (*Id.*).

Based on the Commission's crediting the discussed expert testimony in support of its reliance on the composite sampling, we find that the Commission's conclusion was supported by substantial evidence in relying on the composite testing for support in determining that the dredging would not conflict with the Comprehensive Plan.

---

[2] "David R. Blye, CEAC is a principal chemist with relevant expertise in environmental chemistry, environmental analysis methods (organic and inorganic), and Sampling and Analysis Plan preparation and review." (Findings of Fact at p. 8).

[3] "Gregory J. Cavallo, P.G., is an independent consulting geologist." (*Id.* at p. 9).

### ii. The Commission's Reliance on a Study of Dredging in the Arthur Kill

Plaintiffs argue that "the Commission lacked sufficient information to support its conclusion that the 'elevations in turbidity expected to occur during dredging of the Dock 2 project will not substantially impair or conflict with the aquatic life use and water quality criteria established by the Comprehensive Plan.'" (Doc. No. 45-2 at 19–20). They explain that the Commission based this determination on data presented from a study on the Arthur Kill Waterway, which is near Staten Island. (*Id.* at 17). Plaintiffs assert that the Commission needed to consider "site-specific data regarding the dredge method to be used for the Dock 2 Project" in order to support such a finding. (*Id.* at 18). Instead, the Commission relied on the Arthur Kill data in support of its finding that (1) the dredging will result in a "net benefit" to the Delaware River Basin because it will "remove contaminated sediments," and (2) that the "elevated turbidity" associated with the dredging will be "transient and localized," "the dredge plume is unlikely to reach sensitive aquatic vegetation," and Best Management Practices that will be employed as well as other seasonable restrictions will "further protect sensitive species." (*Id.* at 18). Plaintiffs claim that the administrative record does not include any explanation as to why the Arthur Kill data is demonstrative of potential effects resulting from the Dock 2 Project. (*Id.* at 19). Plaintiffs urge that the Commission should not adopt another agency's decision where it does not include reasoning for how it came to that conclusion. (Doc. No. 57 at 8–9).

The Commission responds that the Commission considered Plaintiffs' objections to the Arthur Kill data, and instead agreed with the expert agencies, NJDEP, USACE, and NMFS, that all found the "data reliable for the purpose of analyzing the impacts of dredging for Dock 2." (Doc. 52-1 at 26).

Delaware River Partners first explains that "the Arthur Kill was just one of many lines of evidence supporting [the Commission's] turbidity findings." (Doc. No. 53-1 at 23). In addition, it

states that it was appropriate for the Commission to adopt the conclusion of the NJDEP and NMFS that the Arthur Kill data was instructive. (*Id.* at 23). Finally, it asserts that Plaintiffs did not question the Arthur Kill data until post-hearing briefing, and did not point to any rule, regulation, or guidance in support of its claim that site-specific turbidity data was required. (*Id.* at 24–25).

The Commission Opinion addresses this argument, and states that "NMFS and NJDEP, whose staff have expertise on endangered and threatened species, concluded that the data had sufficient relevance to the Delaware River conditions to warrant their consideration." (Comm'n Op. at 18 n. 18). The Commission Opinion notes that upon consideration of the evidence presented at the hearing, the Commission was not "persuaded that this conclusion was incorrect or sufficiently uncertain to necessitate further study." (*Id.*). Moreover, the Opinion cites to the Compact in support of its statement that it was appropriate for the Commission to rely on NJDEP and NMFS. (*Id.* (*citing* Compact §§ 1.5, 3.9(b))). The Commission explains that while "under the Compact [the Commission] maintains the authority to review the work of other agencies and reach a different conclusion where warranted, in many instances doing so is unnecessary and would result in duplication of effort." (*Id.* at 9).

The Compact authorizes the Commission to rely upon other agencies. Pursuant to § 1.5 of the Compact,

> It is the purpose of the signatory parties to preserve and utilize the functions, powers and duties of existing offices and agencies of government to the extent not inconsistent with the Compact, and the commission is authorized and directed to utilize and employ such offices and agencies for the purpose of this Compact to the fullest extent it finds feasible and advantageous.

In addition, § 3.9 of the Compact states, in relevant part, that

> The commission shall promote and aid the coordination of the activities and programs of federal, state, municipal and private agencies concerned with water resources administration in the basin. To this end, but without limitation thereto, the commission may:
>
> (a) Advise, consult, contract, financially assist, or otherwise cooperate with any and all such agencies;
>
> (b) Employ any other agency or instrumentality of any of the signatory parties or of any political subdivision thereof, in the design, construction, operation and maintenance of structures, and the installation and management of river control systems, or for any other purpose;

Therefore, according to the Compact, it was appropriate for the Commission to consult with other agencies and rely on their reports and positions. Thus, the Commission's reliance on the positions of NMFS and NJDEP, which they note have expertise on endangered and threatened species, was appropriate. Plaintiffs' argument that because the agencies did not explain their rationale for relying on the Arthur Kill data the Commission should not have credited the agencies' conclusions asks this Court to engage in a credibility determination and weigh the value of the evidence that the Commission points to in support of its conclusion. That is not this Court's role. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute [our own] conclusions for those of the fact-finder'"). Because the Commission based their use of the Arthur Kill data on these additional agencies' position that the data had relevance, this Court finds that the Commission had substantial evidence to support consideration of the Arthur Kill data.

### iii.   The Commission's Examination of Stormwater Impacts

Plaintiffs claim that the Commission "relied entirely on a condition of the Dock 1 Docket in analyzing effect on stormwater discharges" and did not examine the effects of stormwater

"outside of the context of evaluating the potential need for a [pollutant minimization plan]."
(Doc. No. 45-2 at 20–21).

The Commission responds that Dock 2 will only disturb 0.8 acres of land, compared, for
example, to the Dock 1 Project that would affect 218 acres of land and thus included an
extensive stormwater discharge plan. (Doc. 52-1 at 27–28). In addition, it noted that "any
stormwater discharge effects of Dock 2 are the subject of extensive permitting and review by
other expert governmental agencies," including the Gloucester County Soil Conservation District
and NJDEP. (*Id.* at 28).

Delaware River Partners argues that Plaintiffs ignore the fact that the Commission "is not
the only, let alone primary, agency reviewing these issues" and that "the Dock 2 project's
landside development is very limited." (Doc. 53-1 at 26).

The Commission Opinion explained that a "new stormwater collection, conveyance, and
treatment system" was approved as part of Dock 1, that would "improve the quality of
stormwater runoff or discharges at the GLC." (Comm'n Op. at 20). The Commission concluded
that "[n]o additional stormwater outfalls or controls are required for the Dock 2 project." (*Id.*). It
explained that "[t]he sediment will be dredged to a standard 3:1 slope, and sloughing will be
minimal." (*Id.*).

The Commission's conclusion that there would be limited effects of stormwater resulting
from the Dock 2 Project is supported by substantial evidence in the record. The Hearing
Officers' findings of fact indicate that "[s]ince most of the Dock 2 structure is over water and the
landside connection is already accounted for in the overall GLC stormwater management plan,
Dock 2 does not require any additional or different stormwater outfalls or controls." (Finding of
Fact at ¶ 267). This finding is premised on the testimony presented from Laura George of

22

Ramboll. (*Id.*). George testified that there are no stormwater outfalls required for constructing or operating Dock 2. (A.R. IV.5, Tr.1404:11–14 (George)). In addition, Anthony DePasquale, an expert in civil and geotechnical engineering, dredging, dredging disposal, industry and regulatory standards for dredging projects opined that it was "practically impossible" that the dredging would result in a landslide and disturb sediments near the shoreline. (Findings of Fact at ¶ 202; A.R. IV.5, Tr. 1682:20–1684:18 (DePasquale)). This Court finds that the Commission's conclusion that no additional stormwater protections were needed is supported by substantial evidence, relying on fact and expert testimony.

### iv.   The Commission's Conclusion as to Effects on Groundwater

Plaintiffs argue that the Commission failed to consider the effects of construction on water from the Delaware River migrating into groundwater. (Doc. 45-2 at 22). Plaintiffs explain that the Commission stated that the Delaware River is already migrating through the groundwater. (*Id.*). Plaintiffs argue that the Commission failed to consider whether "the *increase* in impervious surface and the *increase* in hydraulic connectivity" caused by construction of Dock 2 will accelerate the issue of infiltration from the Delaware River into the groundwater. (*Id.*).

The Commission explains that because the Comprehensive Plan "contains little direction regarding the clean-up of contaminated land sites and associated groundwater" it is reasonable to defer to member state and federal agencies that have comprehensive standards and programs, as authorized by the Compact. (Doc. No. 52-1 at 30). As such, it points out that the NJDEP found that the Dock 2 Project construction would not impact groundwater. (*Id.* at 31). In addition, the Commission explains that although Plaintiffs' experts and Delaware River Partners' experts

presented conflicting opinions on groundwater, it credited the opinions of fact witness Laura George and expert witness Gregory D. Martin[4] who refuted Plaintiffs' experts. (*Id.*).

Delaware River Partners points out that the Commission made credibility determinations in considering groundwater impacts. It asserts that the Commission's decision to credit certain testimony and evidence over Plaintiffs' expert on stormwater "was reasonable and should not be disturbed on appeal." (Doc. 53-1 at 31). Moreover, it claims that Plaintiffs' argument here that construction might accelerate infiltration, as opposed to cause it, was not raised in the proceedings below and as such may not be presented now. (*Id.* at 31).

The Commission Opinion incorporates the Staff Comments, which discuss this issue. (Comm'n Op. at 21). The Staff Comments explain that this issue primarily relates to Dock 1, but that it was extensively explored nonetheless "under a liberal ruling on admissible evidence." (Staff Comments at 20). The argument that Plaintiffs set forth here was presented by their expert, Peter Demicco.[5] The Commission did not credit his testimony, and instead stated that "each and every theory propounded by Demicco and Henderson was thoroughly and at times devastatingly refuted by [Delaware River Partner's] witnesses George and Martin." (*Id.*). The Staff Comments also noted that "under an ongoing remediation program involving recovery and treatment of groundwater beneath the property, contaminant levels in the groundwater have steadily declined." (*Id.* at 21). Thus, they concluded that "[w]ith respect to potential adverse effects on

---

[4] According to the Hearing Officer's Findings, "Gregory D. Martin, PG, LSRP is Vice President/Principal Hydrogeologist for ROUX, Iinc. His technical specialties are design and implementation of project completion/closure strategies, design and implementation of soil, sediment, groundwater and air investigations, preliminary design and remedial action selection, regulatory coordination and negotiations, and interpretation of federal and state regulations. He has conducted state-lead investigative and remedial activities under NJDEP, PADEP, MDE, DNREC, MADEP, and NYSDEC, among others." (Findings of Fact at pp. 10–11).

[5] "Peter M. Demicco, P.G. is the Principal Hydrogeologist and President of Demicco and Water Associates, LLC. He is a geologist registered and certified in the States of Delaware, Pennsylvania and Virginia. He has technical and professional expertise in water resource evaluations, aquifer testing, groundwater flow modeling, and groundwater-surface water interaction." (Findings of Fact at p. 6).

groundwater, the hearing testimony effectively supported the Commission's view that no substantial impairment or conflict with the Comprehensive Plan would result from development of the GLC and Dock 2." (*Id.* at 22).

On the issue of dredging increasing river water migration, the Commission pointed to Demicco's testimony on cross examination, admitting that movement of river water into the regional aquifer is "a natural phenomenon that would occur absent any dredging or construction activity." (Staff Comments at 21 (*citing* (Tr. 893:25–894:4 (Demicco))). On the issue of the effect of additional impervious cover, Demicco similarly conceded that the River already creates a hydraulic head towards the stie that migrates river water towards the site because the water level in "the aquifer tends to be at or below the river level." (A.R. IV.3, Tr. at 893:16–21 (Demicco)). However, Plaintiffs here do not dispute these concessions, but instead ask whether dredging or construction of impervious surfaces will increase migration or river water into the aquifer. (Doc. No. 45-2 at 22). We note that Demicco reported that "[i]ntroduction of large amounts of impervious coverage" could result in "[m]ore infiltration from the Delaware River." (A.R. DRN-11, Demicco Report at 8).

As stated above, the Commission credited testimony of George and of Martin over that of Demicco. On the issue of increased impervious surfaces, Martin opined that "[n]o change to existing groundwater quality conditions is anticipated due to the Dock 2 Project construction activities. Current soil surfaces (i.e., pervious surfaces) will remain pervious (i.e., no material change) or will be made impervious (e.g., asphalt pavement) which would reduce infiltration of precipitation through remediated legacy soil contamination. It is my opinion that the Dock 2 Project will not affect the existing groundwater quality at the Site." (A.R. DRP-133, Martin Report at 22).

The record reflects that Plaintiffs raised these concerns during the NJDEP comment period for the Waterfront Development Permit. (A.R. III.J45 at 20). The NJDEP responded that "[t]he impacts from the dredging have been minimized by the reconfiguration of the dock to deeper water, *will not have an impact on groundwater*, and is at least 10 feet from a wetland." (A.R. III.J50 at 8 (emphasis added)).

In asking the Court to review this point, Plaintiffs ask the Court to engage in a credibility determination, which is within the province of the Commission in issuing its decision. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Because the Commission's analysis of the effects of groundwater was based on expert testimony as well as reliance on conclusions by the NJDEP, this Court finds that it was supported by substantial evidence. *See id.* at 555 (pointing to expert testimony as "substantial evidence").

### v. The Commission's Evaluation of Water Quality Impacts on Aquatic Life

#### 1. Effects on Submerged Aquatic Vegetation

Plaintiffs claim that the Commission was obligated to evaluate the Project's effect on fish and other aquatic life, and did not sufficiently do so. (Doc. No. 45-2 at 23). Submerged Aquatic Vegetation is a special aquatic site where aquatic life nest, spawn, nurse, and forage. (Doc. 45-1 at ¶¶ 151–52). Plaintiffs explain that Submerged Aquatic Vegetation areas are "sensitive to resuspension and turbidity, potential destabilization of the shoreline, shading, and stormwater discharges." (Doc. 45-2 at 23). They claim that, therefore, the Commission's insufficient support for the effects of sediments and turbidity resulting from the Project and lack of analysis of landside development and its effect on stormwater discharges undermines its conclusions as to the Project's effects on Submerged Aquatic Vegetation. (*Id.* at 23).

The Commission argues that Plaintiffs "essentially incorporate[ their] arguments" that we have already analyzed above "and then state[] for the same reasons addressed in those sections, the Commission's conclusions regarding Dock 2's effects on submerged aquatic vegetation ("SAV") also must be without a sufficient evidentiary basis." (Doc. No. 52-1 at 32). Thus, it states that the argument fails for the same reasons as the arguments discussed above. (*Id.*).

Delaware River Partners similarly states that "this argument fails for the reasons discussed above." (Doc. No. 53-1 at 33).

In the Commission Opinion, it acknowledged Plaintiffs' expert's opinion that "sediment resuspension and turbidity, destabilization of the shoreline and stormwater discharges from the Dock 2 project will cause adverse impacts to SAV." (Comm'n Op. at 18–19). However, it also pointed out that Delaware River Partners "reduced potential impacts to SAV by repositioning Dock 2 to avoid SAV beds" and less than 0.1 acres of SAV would be impacted. (*Id.* at 19). It pointed to the USACE's prohibition against construction between March 15 and September 15 to protect SAV during its growing season. (*Id.*). Specific to the question of resuspended sediment, the Commission pointed to the NJDEP's requirement that best management practices for dredging be used, including use of the environmental bucket to "minimize the area of SAV impacted by resuspended sediment." (*Id.*). It also noted testimony from Laura George that "based on studies of other dredging projects, . . . elevated TSS concentrations would extend on a temporary basis to only a small area around the dredge and not impact SAV beds located near the shore which were the focus of the concerns of [Plaintiffs'] expert." (*Id.*). This position was endorsed by the USACE and NMFS in post-hearing submissions. (*Id.*; A.R. III.J51, USACE Biological Assessment at 19; A.R. III.J53, NMFS Concurrence Letter at 3).

The Commission further explained its conclusion that disturbance of 0.8 acres of land during construction would not pose a significant risk to SAV. (Comm'n Op. at 19). It explained that a new stormwater system was approved as part of Dock 1, that would improve the quality of stormwater runoff or discharges at the GLC. (*Id.* at 20). Specific to Dock 2, no new stormwater outfalls were required and "[t]he sediment will be dredged to a standard 3:1 slope, and sloughing will be minimal." (*Id.*).

The USACE Biological Assessment that the Commission points to provides that "best management practices and the Corps permit conditions will prevent any effects of TSS from mechanical dredging activities from being meaningfully measured, detected, or evaluated." (A.R. III.J51, USACE Biological Assessment at 19). In addition, the increase in turbidity "is below the threshold that would result in a direct adverse effect on juvenile and adult sturgeon." (*Id.*). Similarly, the Commission pointed to a concurrence letter from the NMFS in which the NMFS stated that the effects from TSS from Dock 2 construction would be below the threshold known to effect benthic habitat and accordingly effect benthic prey. (A.R. III.J53, NMFS Concurrence Letter at 3).

The Commission pointed to substantial evidence in support of its analysis of impact to SAV, including the positions of the USACE and NMFS, the fact that the potentially impacted SAV was limited, and the restrictions put in place by other agencies to prevent harm to SAV.

### 2.  Reliance on NMFS Determination

Plaintiffs claim that the Commission erred in relying on the National Marine Fisheries Service's findings in determining the Project's effects on anadromous fish populations. (Doc. 45-2 at 23–24). The National Marine Fisheries Service was consulted during the United States Army Corps Engineers' permitting process, and issued a Letter of Concurrence for the Dock 2 Project.

(Doc. No. 45-1 at ¶¶ 63–64; A.R. III.J53, NMFS Concurrence Letter). Plaintiffs aver that the National Marine Fisheries Service premised its findings on the Arthur Kill study, which Plaintiffs allege is not analogous to analyzing the Delaware River. (Doc. No. 45-2 at 24). Thus, because the study is therefore unreliable, the Commission had an independent obligation to seek additional information like "TSS data from Dock 1 or another Delaware River study." (*Id.* at 24).

The Commission explains that as part of the USACE permitting process for the construction at the GLC, the USACE consulted with the NMFS, which evaluated potential effects on the sturgeon population. (Doc. No. 52-1 at 34). The USACE and NMFS engaged in this evaluation as required by the Endangered Species Act. (*Id.*). The NMFS concluded that the construction would not adversely affect the sturgeon population nor would it cause significant adverse impacts to sturgeon habitats. (*Id.*).

Delaware River Partners argues that the Commission appropriately relied on the expertise of the NJDEP and NMDS. (Doc. No. 53-1 at 33–36). It notes that the NJDEP has a dedicated program for the protection of endangered and threatened species. (*Id.* at 33–34). The NMFS has similar expertise, are tasked with protecting marine and anadromous species, and have expertise in the sturgeon. (*Id.* at 34). The Compact permits reliance. (*Id.*). Finally, it asserts that Plaintiffs' position that the Commission should not have relied on the NJDEP, NMFS, and USACE positions because they are "not reliable" asks this Court to engage in "weighing conflicting evidence and substitute its judgment for [the Commission's]." (*Id.* at 35).

As explained above in Section V.A.ii. of this Opinion, the Compact authorizes the Commission to rely on the expertise of other agencies. Thus, the Commission did not err in relying on the NMFS' findings related to the effects on anadromous fish populations. The NMFS stated that "the effects of the currently proposed action are not likely to adversely affect any

ESA-listed species or critical habitat under our jurisdiction." (A.R. III.J53, NMFS Concurrence Letter at 2). The Commission accepted NMFS' findings that "the expected TSS levels would not adversely affect juvenile and adult estuarine fish" and moreover that the restriction on dredging put in place by the USACE between March 15 and September 15 would "avoid harm to early life stages of sturgeon and render insignificant any impacts to juvenile and other life stages of sturgeon in the area." (Comm'n Op. at 18 n. 18; *see also* A.R. DRP-123, USACE Final Decision at 26–27). Plaintiffs argue that the NMFS' conclusions should not have been relied on by the Commission because they were premised on the Arthur Kill study, an issue already discussed in Section V.A.ii above. Just as this Court determined that the Commission relied on substantial evidence in support of its consideration of the Arthur Kill data, we also find that the Commission's reliance on the NMFS' conclusions as to the effects on anadromous fish is appropriate under the Compact and provides substantial evidence for its conclusions as to the effects on anadromous fish.

### 3. Reliance on New Jersey Natural Heritage Database

Plaintiffs argue that the Commission erred in relying on a New Jersey Natural Heritage Database Search for its determination that mussels would not be harmed by the Project because mussels are not present in the area. (Doc. No. 45-2 at 25). They further assert that the NJDEP's conclusion that there are no mussels in the area should not be relied on as "NJDEP did not require site-specific surveys to conclude that mussels will not be harmed." (*Id.*). They urge that deference is not due to this analysis because it is "based on the absence of data." (*Id.*). Plaintiffs submit that they presented evidence of the presence of mussels. (*Id.*).

The Commission explains that it relied upon the NJDEP's review and the USACE's representations in support of its determination that there would not be harm to mussels. (Doc.

No. 52-1 at 35). It also refutes Plaintiffs' claims of evidence of mussels, explaining that

Plaintiffs' expert opinion that mussels were presented was based on data collected from areas

with different water depth, sediment material, and shoreline development than the Dock 2

Project dredging area. (*Id.* at 35–36). Thus, "[t]he totality of evidence did not demonstrate the

need for more sampling or overcome the evidence showing that mussels are not present." (*Id.*).

Delaware River Partners first states that Plaintiffs' position that deference is not due to

another agency where its analysis is premised on the "absence of data" is incorrect. (Doc. No.

53-1 at 36). It then asserts that the Commission did rely on data from the NJDEP that

demonstrated the absence of mussels. (*Id.*).

The Commission Opinion explained that it relied on information from the NJDEP for its

conclusions about mussels. (Comm'n Op. at 20–21). As Plaintiffs point out, search of the New

Jersey National Heritage Program database did not identify any threatened or endangered mussel

species near the dredging area. (*Id.* at 21). The Commission relied on the NJDEP's decision not

to seek additional information about mussels. (*Id.*). The Commission further pointed to

additional evidence presented at the hearing in support of the decision not to seek a site-specific

mussel survey, as Plaintiffs allege should have been done. (*Id.*). Specifically, the area where

dredging was set to occur was not "favorable mussel habitat" as it was approximately 20 to 40

feet deep, included "little or no SAV," in areas with find grained sediment, and in open water

near the Federal Navigation Channel." (*Id.*). This conclusion is supported by data in the record.

In the Findings of Fact, the Hearing Officer found that according to a study performed by the

Partnership for the Delaware Estuary, "mussel density and richness appeared to peak at depths of

4-6 feet below mean low water and where SAV was present" and "[m]ussel density is negatively

associated with fine-grained sediments such as those found at the Project site." (Findings of Fact

at ¶¶ 343, 345). The Commission noted that Plaintiffs' expert "acknowledged the difficulty in conducting such a survey in Zone 4 of the Estuary which contains waters that are deep and turbid." (Comm'n Op. at 20). Moreover, Plaintiffs' expert, Eric Silldorff,[6] relied on the Partnership for the Delaware Estuary study for his conclusion that mussels may be present, despite the fact that the data for the Partnership for the Delaware Estuary study was pulled from areas that are distinct from the Dock 2 dredging area and are consistent with factors that create a favorable mussel environment. (*Compare* Findings of Fact at ¶ 343 ("The 2015 PDE data was collected from shallow waters less than six feet deep at sites with generally undeveloped or lightly developed shorelines, where mussel density and richness appeared to peak at depths of 4-6 feet below mean low water and where SAV was present.") *with* Findings of Fact at ¶ 344 ("The dredging for the Dock 2 Project will occur some 600 feet from an already developed shoreline, in waters that are approximately 20-40 feet deep and where no SAV is present.")).

The Commission relied on the determination of the NJDEP that no further surveying was needed based on the results of the Natural Heritage Database and the New Jersey Landscape Project. (Findings of Fact at ¶ 350; *see also* (A.R. II.5, Tr. 1614:19–1615:4 (George)). The Commission considered the expert testimony presented by Plaintiffs' experts to suggest the presence of mussels. (Comm'n Op. at 21). However, the Commission concluded that "the testimony at the hearing from DRN's expert regarding data collected from areas that differ markedly from the Dock 2 project area in water depth, sediment material, and shoreline development did not warrant requiring a mussel survey in the Dock 2 area." (*Id.*). Thus, again here the Commission engaged in a credibility determination and weighing of evidence. This Court finds that its conclusion is supported by substantial evidence.

---

[6] "Eric Silldorff is an aquatic ecologist who has studied freshwater invertebrates, including freshwater mussels, for nearly 30 years." (Findings of Fact at p. 8).

**B. The Commission's Consideration of Impacts of the Gibbstown Logistics Center as a Whole in Determining Substantial Impairment or Conflict with the Comprehensive Plan**

Plaintiffs assert that the Commission's failure to consider the cumulative effect of the Dock 1 and Dock 2 Projects is an abuse of discretion, as it does not provide for an accurate evaluation of the effects of the Projects on the Comprehensive Plan. (Doc. No. 45-2 at 29–30).

The Commission points to the Compact, and states that both Dockets met the Compact's definition of a "project," and that the Compact "specifically considers an 'addition to an existing facility' to constitute a new project." (Doc. 52-1 at 36 (*citing* Compact, § 1.2)). The Commission further explains that it "reserved 'the right to amend, suspend or rescind the [Dock 1] docket for cause'" and as such maintained the ability to alter its approval if the cumulative effect conflicted with the Comprehensive Plan. (*Id.* at 37). The commission notes that evidence of the cumulative effects was permitted at the hearing, but that there was no persuasive evidence presented that the cumulative effect presents a substantial conflict with the Comprehensive Plan. (*Id.* at 37–39). The Commission asserts that Plaintiffs put forth "hypothetical questions rather than actual proof." (*Id.* at 39).

Delaware River Partners argues that "Plaintiffs do not cite any [Commission] rule or regulation in support of their argument that the Dock 1/GLC and Dock 2 projects should have been considered 'as a whole.'" (Doc. 53-1 at 38). It notes that Dock 1 construction was nearly completed before Dock 2 was proposed, and the docks serve different functions. (*Id.* at 38). In addition, it asserts that Plaintiffs were "afforded incredibly wide latitude to present evidence about the entire GLC facility, including Dock 1, even though only the approval for the Dock 2 project was at issue." (*Id.* at 39). It argues that none of this evidence demonstrated harm from the two projects together. (*Id.*).

33

We first look to the Compact, which defines an "addition to an existing facility" as a new project. Compact, § 1.2(g). It does not instruct any specific requirement to consider the cumulative effect of particular projects. Thus, the Commission was under no obligation to specifically discuss the cumulative effects of Dock 1 and Dock 2.

Plaintiffs do not detail specific cumulative impacts that the Commission failed to consider, although it references stormwater and PCB contamination. (*See* Doc. No. 57 at 23). That said, the record demonstrates that in making its final determination the Commission did not look at the effects of Dock 2 in a vacuum. Although Plaintiffs point to testimony from the Commission Project Manager David Kovach that the Commission did not examine cumulative impacts, this testimony relates to the process in issuing the initial approval. (Doc. No. 45-2 at 28; A.R. IV.4 at 1274:19–25). At the hearing, the Hearing Officer permitted testimony about cumulative effects, and the Commission referred to Dock 1 in its Opinion. In discussing the effect of stormwater the Commission noted that "[a] new stormwater collection, conveyance, and treatment system to be installed has been approved by NJDEP and its plans have been submitted to [the Commission] as required by the docket for GLC Dock 1." (Comm'n Op. at 20). We also note testimony that dredging from the Dock 1 Project actually resulted in a "net environmental benefit in the River by removing hundreds of pounds of PCB-contaminated sediment." (Findings of Fact at ¶ 58). These points undermine Plaintiffs' suggestion that the Commission ignored cumulative impacts related to stormwater or PCB-contamination. This Court does not find that the Commission erred in failing to analyze specifically any cumulative effect where Plaintiffs identify any cumulative effects that the Commission failed to acknowledge and where the Compact specifically contemplates additions to existing facilities under the definition of a "Project."

34

### C.  The Commission's Consideration of PCB Contamination

Plaintiffs claim that the Commission did not have a sufficient understanding of PCB pollution as the location of the Dock 2 Project at the time it issued the Docket.  (Doc. 45-2 at 34). They claim that the Commission was required to consider PCB discharges pursuant to the Total Maximum Daily Loads ("TMDL") regulations that it implemented concerning PCBs in the Delaware River. (*Id.* at 30–31). Plaintiffs explain that they raised this issue during the administrative process by raising that Delaware River Partners "was required as part of the Dock 1 docket to develop a site investigation and a sampling program for further PCBs in stormwater," which was "yet to be done." (Doc. No. 57 at 25). Plaintiffs thus argue that as the Dock 1 Stormwater Pollution Prevention Plan had not yet been submitted to the Commission, "[i]t was arbitrary, capricious, and an abuse of discretion for the Commission to issue the Dock 2 Docket without sufficient information about the GLC's potentially PCB- laden stormwater discharges." (*Id.* at 27).

The Commission argues that Plaintiffs did not raise this argument during the hearing process, and as such it is waived. (Doc. 52-1 at 39). In addition, the Commission asserts that concerns about compliance with a TMDL are properly raised before the NJDEP or the U.S. Environmental Protection Agency ("EPA"), not the Commission. (*Id.* at 40–43). The Commission also points out that while "wasteload allocations assigned to individual dischargers by the PCB TMDL are enforceable requirements of NJPDES permits issued by NJDEP," the GLC has not been assigned a wasteload allocation. (*Id.* at 43).

Delaware River Partners argues that "Plaintiffs had ample opportunity to introduce this issue in the proceedings below but chose not to," thereby waiving any right to raise the issue in this Court. (Doc. 53-1 at 40–41). It asserts that this argument also fails because it relates to Dock

1 rather than Dock 2, which is not the subject of this appeal. (*Id.* at 42). It further states that "TMDLs assign wasteload allocation to stormwater outfalls, and "Dock 2 does not involve the creation of any new stormwater outfalls." (*Id.* at 43).

Although, as Defendants note, the Commission did not discuss the TMDL, it did consider PCB contamination. The Commission concluded that "the water quality impacts from the Dock 2 dredging are unlikely to create concentrations of PCBs or other toxic substances that would substantially impair or conflict with the Comprehensive Plan." (Comm'n Op at 16). The Commission pointed to the fact that dredging has been used as a remediation method for PCB contamination in sediments. (*Id.* at 15 n. 16). The Commission also pointed to expert testimony that the "the detected concentrations of PCBs in the bulk sediment data were 'commensurate with background concentrations'" and that "the probability of having a material adverse impact to water quality during dredging 'is almost non-existent.'" (*Id.* at 15 n. 17). The Commission also described an expert report that explained that "sediments containing concentrations of PCBs (as determined by bulk sediment data) when suspended by a bucket dredge (not an environmental clamshell bucket) would not cause [the Commission's] water quality criteria to be exceeded using worst case assumptions." (*Id.* at 15).

The question of whether Plaintiffs' claim related to the TMDL is waived requires consideration of the principles of issue-exhaustion. In general, exhaustion requirements are set out via statute or regulation. *Sims v. Apfel*, 530 U.S. 103, 107–08 (2000). However, Courts have applied issue-exhaustion principles even absent statutory or regulatory instruction where the administrative proceedings are adversarial. "The basis for a judicially imposed issue-exhaustion requirement is an analogy to the rule that appellate courts will not consider arguments not raised before trial courts." *Id.* at 108–09. Where the administrative proceedings are adversarial,

judicially imposed issue-exhaustion is more desirable. *Id.* at 109. Here, the administrative proceedings below were adversarial, with Plaintiffs here presenting evidence as to why the Dock 2 Docket should not have been granted and Defendant Delaware River Partners presenting evidence in support of the Docket approval. Thus, requiring issue-exhaustion is consistent with the administrative process in this case.

Our review of the record demonstrates that Plaintiffs did not raise the TMDL report as support for its PCB contamination concerns during the administrative process in a timely manner. Thus, their argument as to how the Commission should have considered the TMDL and incorporated it into their determination is waived. We will not review this question. We do note, however, that the Commission did consider the effect of PCBs and pointed to substantial evidence in support of its conclusion that the Dock 2 Project did not present concerns related to PCB contamination of the water such that the Dock 2 Project would conflict with the Comprehensive Plan. We further note that Plaintiffs' argument here is directed at issues with the Dock 1 Docket that are not the subject of this appeal.

## VI.    **CONCLUSION**

For the reasons expressed above, Defendant's Motion to Strike will be granted in part and denied in part. Summary Judgment will be granted in favor of Defendants and against Plaintiffs.

An appropriate order follows.

Dated: March 31, 2023                              s/ Robert B. Kugler
                                                   ROBERT B. KUGLER
                                                   United States District Judge